[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I. BACKGROUND
The plaintiff, John D. Zewinski, commenced this action by a complaint, dated June 2, 1998, seeking a partition of certain real property located CT Page 7966 in Wethersfield, Connecticut, which is owned by Zewinski and by the defendant, Dorrie A. Volpe. The matter was tried to the court on various dates in September and October, 2000, and in January and February, 2001. At the end of the evidentiary presentation, the court ordered that the parties submit post-trial briefs, in accordance with an agreed-upon briefing schedule. The last of these briefs, plaintiff's rebuttal trial brief, is dated April 9, 2001. The court now issues this decision.
 II. STANDARD OF REVIEW
"The right to partition is founded on the principle that no person can be compelled to remain the owner with another of real property, even if the party seeking partition willingly entered into the joint ownership. . . . General Statutes 52-495 confers an absolute right of partition upon any person holding real property as a tenant in common with others. . . . In those cases where the court finds that a sale of the property would better promote the interests of the owners, the court may order such a sale. General Statutes52-500. . . . This jurisdiction has long favored partition in kind, or physical division, over partition by sale. . . . Because we presume that partition in kind is in the best interests of the owners, the burden of proof rests on the party seeking a sale to demonstrate that it is the better remedy. . . . This burden may be carried by satisfying two conditions: (1) the physical attributes of the property make partition in kind impracticable or inequitable; and (2) the interests of the owners would better be promoted by partition by sale. . . . A plaintiff in an action for partition seeks to sever or dissolve involuntary joint ownership in real property. In furtherance of that objective, a court is limited to rendering a judgment of either partition in kind or by sale of the real property . . . thus terminating the ownership relationship between the parties." (Citations and footnotes omitted.) Wilcox v. Willard ShoppingCenter Associates, 208 Conn. 318, 325-326,544 A.2d 1207 (1988).
In this case, the property at issue contains a single family residence. In her brief, Volpe concedes that it is impractical to have a partition in kind and that Connecticut law requires that the premises be sold through the auspices of a court-supervised partition sale. (Volpe's Trial Brief, p. 21) See Fernandes v. Rodriguez, 255 Conn. 47, ___ A.2d ___ (2000). Thus, she agrees with Zewinski on this point. Accordingly, as reflected below, the court has determined that the premises are to be partitioned by sale. The parties do not agree as to what their respective contributions to the construction and maintenance of the premises were and what their shares of the proceeds of a partition sale ought to be. CT Page 7967
The court, having considered the testimony of the witnesses and the exhibits, makes the following findings.
 III. THE PROPERTY
According to the complaint and the answer, dated August 10, 1998, it is undisputed that Zewinski and Volpe are the co-owners of a certain piece or parcel of land, known as 94 Colonel Chester Drive, Wethersfield, Connecticut (the premises), which is more particularly bounded and described in Schedule A, annexed to the complaint. The premises are subject to a first mortgage, from Zewinski and Volpe, to the defendant First Federal Savings Bank of America, which mortgage has an original principal balance of $62,300.00 and is dated April 1, 1993 and recorded in Volume 543, at Page 477 of the Wethersfield Land Records.
The evidence revealed the following additional facts concerning the premises. At the time the premises were purchased in 1993, by Zewinski and Volpe as joint tenants, the property was a vacant lot. At the time of trial, the premises were occupied by a single family house, consisting of approximately 2800 square feet, and including five bedrooms, five bathrooms, a dining room, a kitchen, and a three car garage. The house was constructed for the purpose of a residence for Zewinski and Volpe, who were never married, and their three children. Ground was broken at the site in June, 1994 and construction was completed in October, 1995. Zewinski and Volpe then began living there with the children. Subsequently, the relationship between Zewinski and Volpe broke down and Zewinski stopped living in the house. Volpe and the children continued to live at the premises and were doing so at the time of the trial.
 IV. NO AGREEMENT
In support of her argument that the court should find that the parties' interest in the premises should be divided equally up to the time Zewinski stopped contributing to the property in July, 1997, Volpe argues that "[i]t is only logical to infer that the intent of the parties was that they would own the subject premises as equal partners." (Volpe's Trial Brief, p. 20) The premise for this position is that the parties were acting as though they were a married couple. As our Supreme Court has stated, "cohabitation alone does not create any contractual relationship or unlike marriage, impose other legal duties upon the parties." Boland v. Catalano, 202 Conn. 333, 339, 521 A.2d 142 (1987) "In the absence of an express contract, the courts should inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract, agreement of partnership or joint venture, or some other tacit understanding between the parties. The courts may also employ the doctrine of quantum meruit, or equitable remedies such as CT Page 7968 constructive or resulting trusts, when warranted by the facts of the case.'" Boland v. Catalano, supra, 202 Conn. 340-341, quoting Marvin v.Marvin, 18 Cal.3d 660, 665, 134 Cal.Rptr. 815, 557 P.2d 106 (1976). "Thus, a contract, express or implied, or some other tacit understanding between persons who are not married to one another which does not rely upon their sexual behavior is enforceable in the courts of this state. See 2 Restatement (Second), Contracts 197-98." Burns v. Koellmer,11 Conn. App. 375, 380-381, 527 A.2d 1210 (1987).
Here, there is no credible evidence upon which to premise any agreement between Volpe and Zewinski as to how they were to share the property. The fact that each contributed to the down-payment is insufficient to demonstrate such an agreement. While they remained a couple, Zewinski contributed more to the property in terms of monetary outlays. In this equitable proceeding, and in the absence of any agreement, the court determines that it is fair for the parties to divide any proceeds from the sale in accordance with the percentages of contribution set forth below.
 V. CONTRIBUTIONS BY THE PARTIES
As noted above, this case was tried to the court over several days. This provided the court with an ample opportunity to observe the witnesses and to assess their credibility, especially that of the parties to this action. The substantial majority of the trial was devoted to their respective claims and counter-claims as to specific contributions each made or did not make to the construction and maintenance of the premises. In addition, the court was presented with over one hundred forty exhibits, most of which concerned these issues. Each party also provided summaries of their monetary claims, and then addressed them in their briefs. The court's findings on these points are based in large part on its assessment of the relative credibility of the parties, as well as on its review of the documentary evidence.
It is evident that each party has searched their respective records in order to try to bolster their respective positions after the fact. What emerged was a picture of a then-united, although unmarried couple, who purchased an unimproved lot in Wethersfield and then went about the construction of a new home on the premises during a period of over a year in 1994 and 1995. They did not engage a general contractor to oversee the project. Instead, the project involved numerous suppliers and contractors, as well as friends and family members (on both sides) working on the job. It is clear that various favors were done and gifts received. A wide range of items were paid for in cash, for the apparent purpose of working "off the books." As with most construction projects, the parties did not then anticipate that all of this would become the CT Page 7969 subject of litigation. The records presented are incomplete, containing partial receipts for some parts of the work and no records of others. As a result of the way in which they conducted this project, including chaotic record-keeping and intentional lack of record-keeping, they created a situation in which the parties' individual credibility would become all the more important in resolving their dispute. Zewinski's Rebuttal Trial Brief, p. 6, concedes that "[i]t is admittedly difficult to quantify and value the plaintiff's work on the property."
The court has set forth below its findings as to their respective contributions, rounded to the nearest dollar:
(1) Zewinski: $176,267.00
(2) Volpe: $91,303.00
The total of their contributions amounts to $267,570.00, resulting in the following equity percentages: Zewinski: 65.88 per cent; Volpe: 34.12 per cent.
Certain of the larger claimed items require comment. The largest single claimed item was by Zewinski for his individual work on the construction, 1200 hours at $45.00 per hour. He testified that that rate is what a general contractor would have paid for the work that he did himself; it is the rate charged by his employer to its construction industry customers for his work as an electrician. He is employed in his family's business (DDJ Electric) as an electrician and was so engaged at the time of the project at the premises; much of the work he did was done on evenings and week-ends or when he had been laid off from his job. The fact that he did work on the job was corroborated by the testimony of two neighboring property owners.
While some of his individual work on the job involved the electrical wiring of the house, he was assisted in that by other members of his family and other employees of the business. In addition, the record reflects that he did general work, including clearing the site, helping with the framing, roofing, painting, installing cabinets, putting up siding, putting in stairs, and building a retaining wall. As part of his claim in this case, Zewinski also seeks credit for the work done by other DDJ employees, Jeff Durant and Martin Coyne. Durant testified that he also cleared the lot, worked on the electrical, and helped with the framing, roofing, and building the stairs. His brother, Martin Coyne, did similar work on the job.
In his claim, Zewinski seeks credit for Durant's work at the rate of $17.00 per hour and for Coyne's work at $14.00 per hour. Since much of CT Page 7970 the work that Zewinski did was substantially similar to that done by Durant and Coyne, there is no justification in charging, for his own time, more than two or three times those rates. Also, Zewinski's brother, Donald Zewinski, testified that Zewinski himself was being paid at the rate of $21.00 per hour by the family business when he worked for it at the time. The court finds that Zewinski's claim for his own work on the project is inflated and has reduced it proportionally.
The second largest item concerns payment to the framer. Both parties testified that an individual named "Carmelo," who was a friend of Volpe's family, was the primary framer. Each claims to have paid him in full, in cash, to the exclusion of the other party. Zewinski claims that he paid $4,000 and that Carmelo received an almost new truck from DDJ Electric. Volpe claims that she paid $28,250.00, all in cash, to a company called Vasile Volanti, for this work. Neither party provided "Carmelo's" last name or his address. Neither party presented "Carmelo" as a witness. As noted above, this is an example of an intentional lack of record-keeping; on this point, the parties agree that, whoever paid him, it was in cash.
Although Volpe asserted that it was she who was the general contractor on this job, she stated that she had no idea how long it took to complete the framing. The invoice she presented, Exhibit TT, does not even list Vasile and Volanti's address, although it contains a hand-written notation "Paid in Full," the initials "CV," and a date of September 5, 1995. Her explanation of the weekly payments she claims to have made was unconvincing. Likewise unpersuasive was Zewinski's claim in this area. if an "almost new" truck had been transferred, there would have been some documentary evidence of it; none was presented. See Hinchliffe v.American Motors Corp., 39 Conn. Sup. 107, 110, 114, 471 A.2d 980 (1982), affirmed, 192 Conn. 252, 470 A.2d 1216 (1984). Since the evidence as to the framing was not credible on either side, the court has discounted the claims in this area.
Volpe presented a December, 1997 appraisal of the premises which was apparently prepared in connection with a previously pending foreclosure. (Exhibit UUUU). She argues that, in view of her effort to save the premises from foreclosure, and the fact that she has kept the mortgage current since then, any appreciation in value of the premises since the date of the appraisal should be hers and that Zewinski is not entitled to share in the same. No authority is cited for this proposition. Volpe has had the benefit of living in the premises during the entire period since the house was ready for occupancy. In view of his contributions to the premises, it would be inequitable to deny Zewinski the benefit of an appreciation in value, if any. CT Page 7971
Conversely, Zewinski argues that, since Volpe has had full beneficial use of the premises, Volpe should not be credited for any mortgage and tax payments she made since July, 1997. Zewinski claims that he has enjoyed no real benefit from his contributions before or after the residence was completed. The court is unpersuaded by this argument. One significant benefit which Zewinski derived was as a parent; the residence provided a home for his children.
 VI. DEFENDANT'S SPECIAL DEFENSE
Volpe pleaded, in her answer, that Zewinski had waived all or a portion of his interest in the premises in a prior proceeding between the parties concerning child support. In her brief, she does not pursue this waiver defense. Accordingly, the court deems this defense to be abandoned. SeeCommission on Human Rights and Opportunities v. Truelove and Maclean,Inc., 238 Conn. 337, 344 n. 11, 680 A.2d 1261 (1996).
Instead of pursuing the waiver defense, Volpe argues that the court's findings in the child support case (No. FA97-0715343) should be persuasive in support of her position that any proceeds from the sale of the premises should be divided equally between herself and Zewinski. She submitted Exhibit XXXX, a transcript of proceedings held before the court (Barall, J.) on April 21, 1998, and argues that "Mr. Zewinski is attempting to use any means possible to manipulate the system into setting a low child support figure and then subsequently asking for most of the equity in the house." (Volpe's Trial Brief, p. 2) In Exhibit XXXX, at p. 11, Judge Barall explained his decision not to order Zewinski to pay back child support, and noted that "there was sufficient documentation that items were paid by Mr. Zewinski for mortgage, taxes, insurance, and all the things related to housing." The court stated also that it could "not ignore the fact that a good portion of child support relates to housing and the cost of housing." (Exhibit XXXX, p. 11) He also noted that "[i]f the housing market had gone up and the house was worth a lot of money today, and not being in a foreclosure, then neither party perhaps would be complaining because you'd own this fifty-fifty." (Exhibit XXXX, p. 11) This action seeking partition was commenced in June, 1998, after the proceedings heard by Judge Barall. Rather than demonstrate that Zewinski was engaged in an effort to "manipulate the system," Judge Barall's comments reflect his reasoning concerning the denial of Volpe's request for an order concerning back child support.
 VII. DEFENDANT'S MOTION TO DISMISS
By motion to dismiss, dated September 5, 2000 (#112), Volpe asked the court to dismiss the action for failure to join necessary parties. Volpe and Zewinski submitted briefs and the court heard oral argument CT Page 7972 concerning this motion. By order dated September 13, 2000, the court denied the motion to dismiss, without prejudice. In the motion, Volpe contended that First Federal Savings Bank of America (First Federal), which holds a mortgage on the premises, and which was named in the complaint as a defendant, had not been properly served with process and was a necessary party. By Withdrawal, dated September 13, 2000 (#116), Zewinski withdrew the action as to First Federal. In addition, in the motion to dismiss, Volpe claimed that Zewinski had promised their children a life estate in the premises, thus requiring him to join them also as necessary parties. In her Trial Brief, Volpe renews her request that the matter be dismissed for failure to join necessary parties.
Procedurally, "the exclusive method to raise the issue of nonjoinder of an indispensable party is by way of a motion to strike the plaintiff's complaint. . . ." Hilton v. New Haven, 233 Conn. 701, 723, 661 A.2d 973
(1995); see also Practice Book § 11-3. "The failure to join an indispensable party does not implicate jurisdiction; [see] W.G. GlenneyCo. v. Bianco, 27 Conn. App. 199, 202, 604 A.2d 1345 (1992); and will not defeat an action on a claim that the court lacked jurisdictional authority to render its judgment. [See] DeRosa v. DeRosa,22 Conn. App. 114, 117, 575 A.2d 713 (1990)." Klanica v.Brodach-Briarcliffe, Inc., Superior Court, judicial district of New Haven at Meriden, Docket No. 253418 (September 5, 1996, Gaffney, J.). Notwithstanding the rule requiring the issue to be raised via a motion to strike, the Appellate Court has reviewed a claim of nonjoinder even though no such motion was filed. See Gaudio v. Gaudio, 23 Conn. App. 287,305-306, 580 A.2d 1212, cert. denied, 217 Conn. 803, 584 A.2d 471
(1990).
"Indispensable parties include any person having a property interest that might be affected by the judgment." Akridge v. Nastri, Superior Court, judicial district of New Haven at New Haven, Docket No. 397087 (October 7, 1997, Lager, J.) (20 CLR 566), citing Gemmell v. Lee,42 Conn. App. 682, 685, 680 A.2d 346 (1996). "A party is defined as indispensable if its interest in the case is such that a final judgment cannot be entered without either affecting the party's interest or leaving the case in such condition that its final resolution may be inconsistent with equity and good conscience." W.G. Glennev Co. v.Bianco, supra, 27 Conn. App. 203.
Our Supreme Court has defined necessary parties as "[p]ersons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it. . . . [B]ut if their interests are separable from those of the parties before the court, so that the CT Page 7973 court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the latter are not indispensable parties. . . ." (Citations omitted; internal quotation marks omitted.) Biro v. Hill, 214 Conn. 1, 5-6, 570 A.2d 182 (1990).
Here, the mortgagee, First Federal, "while obviously interested in the outcome of the [case], [is] neither necessary or indispensable . . . to the disposition. . . ." Levine v. Police Commission, 28 Conn. App. 344,352, 612 A.2d 787, cert. denied, 223 Conn. 923, 614 A.2d 824 (1992). This court's judgment, in which it has ordered a partition by sale, is appropriately reached in the absence of this interested party. The sale will be accomplished subject to First Federal's prior interest as a mortgagee. The relief ordered by the court protects and retains the integrity of the mortgagee's interest. McWilliams v. Morton, 97 Conn. 514,117 A. 557 (1922), cited by Volpe, does not hold to the contrary. There, the appellant had encumbered the property at issue with an unexpired option to purchase, quite a different form of interest than that of First Federal here. See id., 97 Conn. 517-518.
Concerning the children, Zewinski argues that General Statutes §52-550, the Statute of Frauds, bars any claim that he created a life estate in the premises for them. In response, Volpe, while conceding that no written instrument creates such an estate, asserts that the doctrine of part performance takes the case outside the statute.
Section 52-550 provides that no civil action may be maintained, in the absence of a written agreement, signed by the party to be charged, "upon any agreement for the sale of real property or any interest in or concerning real property." Under the statute, oral agreements concerning interests in real property are unenforceable. See LR Realty v.Connecticut National Bank, 53 Conn. App. 524, 541, 732 A.2d 181, cert. denied, 250 Conn. 901, 734 A.2d 984 (1999). Our Supreme Court has "held that acts on the part of the promisee may be sufficient to take a contract out of the statute if they are such as clearly refer to some contract in relation to the matter in dispute." (Internal quotation marks omitted.) Ubysz v. DiPietro, 185 Conn. 47, 54, 440 A.2d 830 (1981). While acts of part performance may take a case outside the statute, our Supreme Court has stated that "[t]he acts of part performance generally must be such as are done by the party seeking to enforce the contract, in pursuance of the contract, and with the design of carrying the same into execution, and must also be done with the assent, express or implied, or knowledge of the other party, and be such acts as alter the relations of the parties. . . . The acts also must be of such a character that they can be naturally and reasonably accounted for in no other way than by the existence of some contract in relation to the subject matter in dispute. . . ." (Citation and internal quotation marks omitted.) CT Page 7974Ubysz v. DiPietro, supra, 185 Conn. 54. In addition, "the conduct alleged to have been induced by reliance on the oral agreement must be of such character that repudiation of the contract by the other party would amount to the perpetuation of a fraud." (Internal quotation marks and citations omitted.) H. Pearce Real Estate Co. v. Kaiser, 176 Conn. 442, 443,408 A.2d 230 (1979).
Having heard the testimony and evaluated the credibility of the witnesses, the court does not credit Volpe's claim that she and Zewinski had an oral agreement that each child would obtain a life estate in the premises. Here, the alleged acts of part performance, including the building of the house, the fact that Volpe and the children have lived there since it was ready to be occupied, the payments toward the mortgage, as well as other expenses, and Volpe's efforts to avoid foreclosure, all are of such a character that they can be accounted for in at least one other way, rather by the existence of a contract. Parents of small children, such as Volpe, as well as individuals who do not have children, generally want to live in their own homes and take such actions to create and maintain them. Life estates are not necessarily created in such situations. No such life estate was created here. The children are not necessary or indispensable parties to this action. Accordingly, Volpe's renewed motion to dismiss is denied.
 VIII. SALE OF THE PREMISES
As set forth above, the parties agree that the law requires the premises to be sold. In accordance with General Statutes § 52-502, the parties agree that a committee should be appointed to effectuate the sale. In addition, as each party acknowledges in their briefs, it is in their best interests, if one of them purchases the premises, that the property go to the highest bidder.
Accordingly, the court orders:
(1) that a committee be appointed to effectuate a sale of the premises, subject to the approval of the court. Within fourteen days of the committee's establishment of a listing price for the premises, which shall be provided to the parties and to the court contemporaneously, each party shall submit its bid, if any, for the premises, to the committee, accompanied by documentary proof (to the satisfaction of the committee) of valid financing, such as a mortgage commitment, as well as by a cash deposit in the amount of ten per cent (10%) of the bid. if either party does not submit a timely bid, that shall constitute a waiver of the opportunity to purchase the premises. Either party shall be allowed a first option to purchase the premises for the established list price, or CT Page 7975 greater, prior to it being placed on the open market. In the event both parties submit such bids, the premises shall be sold to the higher bidder (less that party's established equity in the premises, as set forth above).
(2) The committee is directed to ascertain the status of claims of all persons who may claim to have an interest in the premises, including First Federal. To the extent that there are any encumbrances which attach to the interest of one party to this action, the committee is to identify such to the court so that such encumbrances may be satisfied out of such party's respective share of the net proceeds after sale.
(3) The committee shall be empowered to advertise and/or list the premises for sale, to undertake any title examination necessary to clearly identify any interests in the premises, and to engage the services of an appraiser to ascertain the current fair market value of the premises.
(4) At the time the committee requests the court's approval of the proposed sale, the committee's submission shall include a settlement statement listing the costs of sale, including the fees of the committee; a report to the court of all encumbrances of record as of the date of sale that are to be satisfied from the proceeds before any distribution to the parties; and a proposed distribution of the proceeds after costs in conformance with the court's judgment, as stated above.
(5) In the event that Volpe does not purchase the premises, Zewinski has requested that the court set a date certain for her departure from the premises in advance of the sale. The committee is directed to report to the court its recommendation as to whether or not such a departure in advance will facilitate the sale.
It is so ordered.
BY THE COURT,
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT